J-S18038-26          2026 PA Super 166

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                                     :           PENNSYLVANIA
                                                     :
                          v.                         :
                                                     :
                                                     :
                                                     :
WALEEM FELDER                        :
                                                     :
                    Appellant                  : No. 737 MDA 2025

Appeal from the Judgment of Sentence Entered March 5, 2025
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0000132-2024

BEFORE: DUBOW, J., BECK, J., and BENDER, P.J.E.

OPINION BY BENDER, P.J.E.:                    **FILED: JULY 31, 2026**

Waleem Felder ("Appellant") appeals from the judgment of sentence imposed following his non-jury trial convictions for, *inter alia*, risking a catastrophe and evading arrest on foot. Appellant challenges the sufficiency of the evidence supporting those two convictions. We agree with Appellant as to risking catastrophe and discharge that conviction. We reject his challenge to the remaining conviction. Because our discharge disrupts the trial court's sentencing scheme, we vacate and remand for resentencing.[1]

On November 13, 2023, shortly before 9:30 p.m., Lancaster City police officers Joseph Good and Nathan Parr were on patrol and observed a parked Nissan Altima with windows tinted to the degree Officer Good "was unable to

---

[1] ***See, e.g., Commonwealth v. Thur***, 906 A.2d 552, 569 (Pa. Super. 2006) ("If our disposition upsets the overall sentencing scheme of the trial court, we must remand so that the court can restructure its sentence plan.").

see into the passenger compartment to see the occupants." N.T., 1/7/25, at 9. The Altima, operated by Appellant,[2] left its spot. Officers Good and Parr followed and shortly thereafter activated their lights and siren. *Id.* at 22.

The parties stipulated that "members of the Lancaster City Bureau of Police attempted to stop a vehicle in the area of the 400 block of East End Avenue," which led to a pursuit "to the first block of South Mulberry Street[.]" *Id.* at 12. Appellant went through at least two stop signs without slowing; however, departmental policy required the officers to "safely slow down and make sure" the intersection is clear before proceeding. *Id.* at 31-32. As a result, at some point during the pursuit the officers "could no longer safely keep pace" with Appellant. *Id.* at 31. Officer Good testified that their speed ranged from 25 to 40 miles per hour. *Id.* at 35.

Police officers located Appellant's abandoned vehicle next to a building. The parties stipulated to the admission of videos captured by cameras operated by the Lancaster Safety Coalition, one of which depicted Appellant "turn[ing] off of Mulberry Street onto High Street, going towards Strawberry. In doing so, it clipped a gas meter on a house on the north side of the northwest side of the intersection. The vehicle then coasted to a stop. The driver exited the vehicle and fled on foot." *Id.* at 102. At the time Appellant jumped out, the vehicle was "still [moving] on the sidewalk and str[uck] 305 West Mifflin." *Id.* at 41.

_____

[2] Appellant challenged identity at trial but does not raise that issue on appeal.

- 2 -

Officers evacuated the building while awaiting a response from the fire department. *Id.* at 95. Sergeant Christopher Kophamel responded to the scene and testified that the leak risked "fire and any kind of damage to houses and injuries to anybody in that area" had the gas been ignited. *Id.* at 104. Firefighters ultimately stopped the leak without incident.

The trial court found Appellant guilty of all offenses and sentenced Appellant to an aggregate sentence of 45 months to 12 years' incarceration. Appellant timely filed a post-sentence motion, which was denied. Appellant thereafter filed a timely notice of appeal and complied with the trial court's order to file a Pa.R.A.P. 1925(b) statement. The trial court issued its responsive opinion, and the matter is ready for review. Appellant raises two claims:

> I. Was the evidence presented by the Commonwealth insufficient to sustain [Appellant's] conviction for risking catastrophe where he did not recklessly create a risk of catastrophe, as he did not consciously disregard a substantial risk that he would lose control of his car and sever a gas line?
>
> II. Was the evidence presented by the Commonwealth insufficient to sustain [Appellant's] conviction for evading arrest or detention on foot, where at the time he left his vehicle there was no public servant attempting to lawfully arrest or detain him, as no police officer was present at the scene of the accident nor following him and attempting to arrest him as he traveled on foot to the Shamrock Cafe?

Appellant's Brief at 7.

Both of Appellant's claims address whether the Commonwealth presented sufficient evidence to meet its burden to prove his guilt beyond a reasonable doubt. Our standard of review is well-settled. "Because a

determination of the sufficiency of the evidence presents a question of law, our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Ewida***, 33 A.3d 1269, 1279 (Pa. Super. 2025) (internal quotation marks and citation omitted).

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt.

***Commonwealth v. Mumford***, 353 A.3d 247, 256 (Pa. Super. 2026) (citation omitted).

<u>Risking a catastrophe</u>

An individual is guilty of risking a catastrophe if he or she "recklessly creates a risk of catastrophe in the employment of fire, explosives or other dangerous means listed in subsection (a) of this section." 18 Pa.C.S. § 3302(b). The "other dangerous means" set forth within subsection (a) are those capable of "causing potentially widespread injury or damage[.]" ***Id.*** § (b).

Appellant's argument is that the Commonwealth failed to establish the *mens rea* of recklessness, which is defined as follows:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross

deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S § 302(b)(3).

Appellant concedes that his act of "fleeing from police in his vehicle was deliberate[.]" Appellant's Brief at 18. However, he submits that the "loss of control of the vehicle such that it jumped the sidewalk and severed a gas line was purely accidental." *Id.* On this point, Appellant notes that the trial court may have concluded that Appellant intentionally struck the gas line. *See id.* at 19 ("The Commonwealth argued, and the court found that [Appellant] caused his vehicle to 'strike and destroy a gas meter.'") (citing Trial Court Opinion, 10/6/24, at 5). Appellant argues that this

> is not consistent with the facts, and implies a level of deliberation that simply did not exist. [Appellant] lost control of his vehicle as he was attempting to navigate what police described as a sharp turn onto Mifflin Street and the vehicle left the roadway and struck a house, shearing off a gas line. He did not cause his vehicle to strike and destroy a gas meter—this was clearly an accident.

*Id.* at 19.

Thus, Appellant suggests that while he may have been guilty of reckless driving, he did not act recklessly with respect to the creation of a "catastrophe" as set forth within Section 3302(a).[3] *Id.* ("While [Appellant] could possibly have been convicted of reckless driving … his driving did not demonstrate a conscious disregard that he would cause widespread injury and damage, which requires more than a traffic accident.").

---

[3] Appellant does not argue that the Commonwealth failed to present sufficient evidence that the gas leak and accompanying threat of an explosion or fire qualified as a "catastrophe."

The Commonwealth focuses its analysis on Appellant's decision to flee from police and drive recklessly while doing so, and does not indicate in its brief whether it views the evidence as supporting an inference that Appellant deliberately crashed his vehicle into the building and/or the gas line. Commonwealth's Brief at 9 ("This was not 'purely accidental,' [Appellant] consciously disregarded the risks of his conduct when he deliberately fled from police[.]"). The Commonwealth argues that the statute "requires only that the 'means' by which an individual risks catastrophe 'have the potential to cause catastrophe.'" *Id.* at 7. The Commonwealth cites for persuasive value our decision in *Commonwealth v. Salazar*, No. 800 MDA 2024, 2025 WL 882903, at *1 (Pa. Super. Mar. 21, 2025), which upheld a risking catastrophe conviction for striking a building with a car. Additionally, the Commonwealth cites *Commonwealth v. Miller*, 955 A.2d 419 (Pa. Super. 2008), a case in which we upheld a conviction for aggravated assault where a fleeing motorist struck a vehicle and caused serious injuries. That crime requires the heightened *mens rea* of malice. The Commonwealth argues that the facts of this case are similar to *Miller*, and "[i]t stands to reason that if those actions are sufficient to prove recklessness rising to the level of malice, they must be sufficient to prove [Appellant] had the requisite reckless *mens rea* for [r]isking [c]atastrophe, which is not held to the higher standard of malice." Commonwealth's Brief at 9.

We begin by setting forth our conclusion that these facts do not support an inference that Appellant deliberately struck the gas line. This is an

important predicate question because the case that Appellant "consciously disregard[ed] a substantial and unjustifiable risk" that his driving risked a catastrophe is obviously stronger if Appellant deliberately struck the building. Granting the Commonwealth the benefit of all inferences as we must, that inference is not supported. First, we note that the Commonwealth did not allege that Appellant intentionally struck the building. The criminal information alleged: "The defendant did recklessly create a risk of a catastrophe by … other dangerous means … TO WIT: Actor did flee from Police Officers in a vehicle at a high rate of speed and did eventually crash the vehicle into a gas line, causing a severe gas leak[.]" Criminal Information, 2/14/24. The language "did eventually crash" is somewhat ambiguous but in conjunction with its argument centered on Appellant's "reckless use of an automobile" it appears that the Commonwealth likewise does not view the case through the lens of an intentional strike. Commonwealth's Brief at 10. Furthermore, the circumstances of the crime indicate that Appellant's goal was to flee the police, not crash into a building. Indeed, Officer Good testified that he and his partner originally turned down another street as they believed Appellant could not safely make the turn onto the street where he crashed.

Q. Did you guys miss this turn?

A. Yes. We believed that since [Appellant] was completely out of view and we didn't believe he had any chance of navigating that very sharp turn on the left, Mifflin, I inferred that the only possible safe route he could have taken at that speed would have been north on South Mulberry since he was already going in that direction. So we actually continued northbound and drove over King Street, and I notified other units that the vehicle had to have

gone either north on Mulberry Street or possibly had then turned from Mulberry to eastbound on King Street. But I didn't think there was any possibility the vehicle could have turned on West Mifflin at that speed.

N.T., 1/7/25, at 41-42.

Thus, the evidence suggests that Appellant made a risky turn as part of his attempts to avoid capture, as argued in the Commonwealth's closing argument. N.T., 1/8/25, at 225 ("The defendant made a very risky and very dangerous unsafe turn. He went on the sidewalk and hit that property, that building's gas meter."). We conclude that nothing in the record supports an inference that Appellant intentionally hit the building and its gas meter. Therefore, our analysis proceeds from a finding that Appellant accidentally struck the building and the meter after losing control of his car.

Having concluded that the Commonwealth failed to establish that striking the gas line was a deliberate act, we reject its argument that our unpublished decision in **Salazar** is persuasive. There, Theresa Salazar "drove her minivan through the entrance of the Little League Museum in South Williamsport" on July 3, 2022. **Id.** at *1. Unlike this case, the evidence established that Salazar deliberately targeted the building. Her vehicle "crashed into the entryway and momentarily stopped in the vestibule," and Salazar then "hit the accelerator, crashed through another set of lobby doors and drove further into the building until hitting an interior wall approximately 20-25 feet north of the interior lobby doors." **Id.** (quoting trial court opinion). Six individuals "were in the immediate area of the impact, and approximately three dozen other employees and patrons were in the building at the time."

*Id.* (same). Upon hitting the interior wall, Salazar "turned to an employee and said, 'I am Teresa Salazar. You know who I am, and you should be scared.'" *Id.* (same). Additionally, the Commonwealth established that Salazar had believed "that Little League Baseball should have credited her relatives ... as co-founders of Little League." *Id.* Salazar had previously requested compensation from the organization and had "left several voice mails with Little League Baseball on the day before, and on the morning of, the incident." *Id.* (citing trial court opinion).

Salazar was convicted, among other crimes, of risking a catastrophe. Her sufficiency argument on appeal focused on whether the Commonwealth established she employed "dangerous means" and asserted that "her actions did not risk the widespread injury or damage required" by the statute. *Id.* at *2. We agreed with the trial court that "[w]hen one deliberately or recklessly propels two tons of metal and related materials at speed into an occupied business during normal business hours on a holiday weekend, when it may very well be occupied by many people, widespread injury to persons and damage to property is a possible, if not a probable, outcome." *Id.* (quoting trial court opinion). The Commonwealth argues that the case is analogous:

> Like Salzar [sic], [Appellant] in this case recklessly piloted his vehicle through several city blocks filled with businesses and homes, recklessly navigated a sharp left turn at a high rate of speed, and recklessly abandoned his still moving vehicle causing it to strike a residence and sever a gas meter. As in *Salzar* [sic], the widespread injury to persons or property was not just the possible outcome of [Appellant's] actions but the probable one.

Commonwealth's Brief at 8.

The primary issue in *Salazar* was whether Salazar's actions risked a "catastrophe," not whether she acted recklessly. Relatedly, the Commonwealth's analysis fails to account for the material difference in the facts and inferences to be drawn from those facts. The evidence in *Salazar* established that Salazar deliberately crashed into a building as part of a longstanding animus towards the Little League organization. Our General Assembly states that a "person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct." 18 Pa.C.S. § 302(b)(3). The "'[c]onscious disregard' of a risk, in turn, involves first becoming aware of the risk and then choosing to proceed in spite of the risk." *Commonwealth v. Huggins*, 836 A.2d 862, 865 (Pa. 2003). Salazar's choice to target a specific building and continue to drive into its structure after knowing people were inside demonstrates a conscious disregard of consequences in a way that an accidental crash does not. Accordingly, we deem *Salazar* distinguishable.

The remaining question is whether the Commonwealth presented sufficient evidence to support an inference that Appellant consciously disregarded a substantial risk that his operation of the vehicle would result in striking a gas line. We agree with Appellant that "[t]he odds of [Appellant's] vehicle striking a gas line were so small that he could not have consciously disregarded the risk of widespread injury or damage in this manner." Appellant's Brief at 20-21. "The 'risk' proscribed by this legislation is the use

of dangerous means by one who 'consciously disregards a substantial and unjustifiable risk' and thereby [u]nnecessarily exposes society to an extraordinary disaster." **Commonwealth v. Hughes**, 364 A.2d 306, 311 (Pa. 1976). As a matter of law, we conclude that the alleged "dangerous means" in this case—recklessly fleeing from police, losing control of the vehicle, and accidentally striking a building—does not risk exposing society to an extraordinary disaster.

This conclusion addresses the Commonwealth's argument that **Miller** supports upholding the conviction. In **Miller**, officers observed Miller's vehicle speeding and used hand signals to tell the driver to stop. **Miller**, 955 A.2d at 420. Miller pulled over and, as the officer was about to exit his vehicle, Miller "'gunned' the engine of his vehicle and fled the scene at a high rate of speed." **Id.** Miller went through a stop sign and multiple traffic lights; ultimately, he collided with a vehicle, which then hit another vehicle. **Id.** The occupants of these vehicles were seriously injured. Miller was convicted of aggravated assault, which requires proof of malice. We rejected Miller's argument that the Commonwealth failed to meet its burden.

The Commonwealth reasons that if Miller acted with malice when fleeing from police, which is a higher standard than recklessness, it surely follows that Appellant acted recklessly. The Commonwealth's analysis focuses on the conduct without accounting for the result. We can accept for purposes of our disposition that Appellant's reckless behavior risked striking pedestrians or other vehicles. Had Appellant done so and caused serious injuries, **Miller**

would be a pertinent case. It does not follow, however, that recklessly fleeing from police establishes a conscious disregard of an "extraordinary disaster" such as a gas leak. Recklessness entails an insufficient concern with the risk that the conduct will lead to a **particular** result, in this case, a "catastrophe." Appellant's actions, while wholly unacceptable, did not demonstrate an awareness and subsequent conscious disregard of a "substantial" risk that he would cause an "extraordinary disaster."[4] Thus, we must vacate this conviction.

### Evading arrest

Appellant's second claim challenges the sufficiency of the evidence supporting his conviction for evading arrest. The statutory text reads: "A person commits an offense if the person knowingly and intentionally flees on

---

[4] The Commonwealth's argument suggests that most suspects who flee in a vehicle from police are guilty of risking catastrophe because guilt under section 3302(b) does not turn on whether an actual catastrophe is created. ***Commonwealth v. McCoy***, 199 A.3d 411, 417 (Pa. Super. 2018). We cannot agree with this broad proposition.

Additionally, the statute does not contain an exclusive list of "dangerous means" and thus the cited behavior here could qualify. Simultaneously, "it is clear that the forces or substances intended to be regulated are those which are capable 'of causing . . . widespread injury or damage'." ***Hughes***, 364 A.2d at 312. The forces specifically enumerated in Section 3302(a)— explosion, fire, flood, avalanche, collapse of building, release of poison gas, and radioactive materials—share a common thread in that they all can foreseeably lead to widespread injury or damage if misused. Recklessly driving a vehicle, while obviously dangerous, does not inherently pose such risks.

- 12 -

foot from a public servant attempting to lawfully arrest or detain that person."
18 Pa.C.S. § 5104.2(a).

This statute is relatively new, as it was enacted in 2022. Citing a memo by Senator John Yudichak, Appellant explains that the crime "was proposed after the death of a Scranton Police officer who fell to his death while chasing three teenagers suspected of armed robbery." Appellant's Brief at 24 (quoting memo).[5] Continuing, Appellant notes that the statute "was created to address the risk of harm to police and innocent bystanders which is caused by a suspect fleeing from police on foot." *Id.* at 24-25. Appellant points out that when he fled on foot "there were no police officers in the area, as they had lost him ... [and were] several blocks away." *Id.* at 25. Addressing the statutory terms, Appellant rejects the conclusion that the "knowingly and intentionally" language applies to his initial decision to flee from Officers Good and Parr, reasoning that the "knowingly and intentionally" requirement requires the presence of a police officer at the moment he fled on foot.

> A violation of this statute requires *both* a person who is knowingly and intentionally fleeing on foot *and* a public servant who is present and attempting to arrest or detain them. The issue is not whether police issued an order to stop when the defendant began fleeing on foot, but whether the police were present at any time while the defendant was fleeing.

Appellant's Brief at 26.

---

[5] The memo is available at http://www.palegis.us/senate/co-sponsorship/memo?memoID=35180&document=SB814.

We disagree. While Appellant frames this issue as implicating the sufficiency of the evidence, he actually presents a question of statutory interpretation. We apply the following principles.

> Although [T.Q.B.] states her issue as challenging the sufficiency of the evidence, the argument is couched in terms of statutory construction.
>
> > Where reviewing a claim that raises an issue of statutory construction, our standard of review is plenary. We recognize:
> >
> > > Our task is guided by the sound and settled principles set forth in the Statutory Construction Act, including the primary maxim that the object of statutory construction is to ascertain and effectuate legislative intent. 1 Pa.C.S. § 1921(a). In pursuing that end, we are mindful that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Indeed, "[a]s a general rule, the best indication of legislative intent is the plain language of a statute." In reading the plain language, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage," while any words or phrases that have acquired a "peculiar and appropriate meaning" must be construed according to that meaning. 1 Pa.C.S. § 1903(a).
> > >
> > > However, when interpreting non-explicit statutory text, legislative intent may be gleaned from a variety of factors, including, inter alia: the occasion and necessity for the statute; the mischief to be remedied; the object to be attained; the consequences of a particular interpretation; and the contemporaneous legislative history. 1 Pa.C.S. § 1921(c). Moreover, while statutes generally should be construed liberally, penal statutes are always to

> be construed strictly, 1 Pa.C.S. § 1928(b)(1), and any ambiguity in a penal statute should be interpreted in favor of the defendant.

*Int. of T.Q.B.*, 286 A.3d 270, 275 (Pa. Super. 2022) (paragraph break added), *aff'd*, 311 A.3d 1009 (Pa. 2024).

Appellant presents his argument in terms of the plain meaning. "The Commonwealth and the [trial c]ourt's interpretation of the statute belies the plain language of the statute[.]" Appellant's Brief at 26. We disagree. The statute only requires that Appellant "knowingly and intentionally fle[d] on foot from a public servant attempting to lawfully arrest or detain" him. 18 Pa.C.S. § 5104.2(a). There is no requirement that the public servant be present at the moment the suspect flees on foot. Appellant's argument that he neither knowingly nor intentionally fled from the police hinges on our agreement that there be "a public servant who is present and attempting to arrest or detain" the fleeing individual. Appellant's Brief at 26. The problem with this argument is that the plain language does not include that requirement. *Commonwealth v. Sanchez-Frometa*, 256 A.3d 440, 447 (Pa. Super. 2021) ("It is impermissible to interpret a statute by adding words and phrases in a manner that affects its scope and operation.").

Therefore, Appellant's "plain language" argument appears to be motivated by what he perceives to be the spirit of the statute. "There is no evidence in the record that any police officers or bystanders were endangered by [Appellant] leaving the scene of the accident, and no evidence that any police officers were present while he left the scene and proceeded to the

Shamrock Cafe[.]" *Id.* at 26. This policy argument[6] finds no support in the text, and the General Assembly could have inserted a requirement that an officer be on scene. *Cf. Hackett v. Commonwealth*, 889 S.E.2d 672, 678 (Va. 2023) ("Virginia thus appears to be unique in requiring—as an element of the offense—that the officer have the 'immediate physical ability' to arrest the defendant."). Because it did not, Appellant's challenge fails.

Risking catastrophe conviction discharged. Evading arrest on foot conviction affirmed. Judgment of sentence vacated and case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/31/2026

---

[6] While we need not address whether the General Assembly's policy aims were accomplished in this case, we note that Appellant's argument fails to account for the potential danger to bystanders as well as himself, both of which were also cited in the memo.